Xadrian MCCRAVEN, Plaintiff,

v.

CITY OF CHICAGO, a municipal corporation, Glenn E. Carr, John F. Harris, Thomas Sadler, Valerie C. Rodgers, and Raymond Johnson, Defendants.

No. 97 C 8845.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 11, 2000.

Steven A. Adatto, Kusper & Raucci, Chtd, Chicago, IL, for Plaintiff.

Daphna Leah Boros, City of Chicago Corporation Counsel, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff sued Defendants, claiming that Defendants refused to hire him because of his race, in violation of his civil rights under federal and state law. For the reasons set forth below, Defendants' Summary Judgment Motion is granted.

### FACTUAL BACKGROUND

Plaintiff Xadrian McCraven, an African–American male, applied for the position of probationary police officer with the Chicago Police Department ("CPD") in 1991.[1] (Pl.'s Local Rule 56.1 Resp. Defs.' Statement Undisputed Material Facts ["Pl.'s Resp. 56.1"] at 1). The CPD conducts background investigations of all applicants, and assigned Detective Raymond Johnson to investigate Plaintiff. (Pl.'s Resp. 56.1 at 12). Before Detective Johnson could complete his investigation, however, Plaintiff learned that he had failed the CPD's psychological examination and was, therefore, disqualified from employment. *McCraven v. City of Chicago*, 18 F.Supp.2d 877, 880 (N.D.Ill.1998). Shortly thereafter, Plaintiff was notified that the CPD's psychological examination was the subject of a settlement in a bias suit and that he was again eligible for employment with the CPD. *Id.*[2]

Before reapplying to the CPD, however, Plaintiff took steps to improve his chances for employment. On March 31, 1992, Plaintiff filed a Petition to Expunge his arrest record with the Circuit Court of Cook County, Illinois. (Pl.'s Resp. 56.1 at 63.) In support of his Petition, Plaintiff swore under oath that "[h]e has not previously, nor has he subsequently been convicted of any criminal offense or any municipal ordinance violation." (Defs.' 56.1 at 63.) On December 30, 1992, Presiding Judge Thomas Fitzgerald granted Plaintiff's Petition and expunged Plaintiff's twenty-four arrests. (Pl.'s Ex. 1.)

In 1993, Plaintiff resubmitted his application to the CPD. (Pl.'s Resp. 56.1 at 13.) The CPD initially assigned Detective Valerie Rodgers to conduct Plaintiff's background investigation for the 1993 application. (Pl.'s Resp. 56.1 at 14.) Pursuant to CPD procedures, however, the CPD subsequently reassigned the task of conducting Plaintiff's background investigation to Detective Johnson. (Defs.' Local Rule 56.1 Statement Undisputed Material Facts [Defs.' 56.1] at 15.)[3]

---

1. Plaintiff authorized the release of his arrest record to the CPD by signing a waiver, which provided:

   > I desire that the City of Chicago Police Department conduct a thorough investigation to determine my qualifications and suitability for the position of Probationary Police Officer. I understand that arrest record information is essential if the City of Chicago, Department of Police, is to make a determination of my qualifications and suitability for employment.
   (Pl.'s Resp. 56.1 at 11.)

2. Apparently, Plaintiff had applied for a job as a CPD police officer prior to 1991, but was informed that his arrest record would prevent an offer of employment. *McCraven*, 18 F.Supp.2d at 880.

3. Local Rule 56.1(b)(3)(A) states that, in the case of disagreements, the responding party

In response to Detective Johnson's standard inquiries regarding Plaintiff, the Federal Bureau of Investigations ("FBI") returned Plaintiff's fingerprint card showing that Plaintiff had been arrested five times. Detective Johnson ultimately learned that Plaintiff had been arrested at least twenty-four times. (Defs.' 56.1 at 25.) Detective Johnson discovered that Plaintiff had been arrested for offenses such as retail theft, attempted theft and robbery, possession of cannabis and a controlled substance, arson, unlawful use of a weapon, disorderly conduct, communicating with a witness, and aggravated assault. (Defs.' 56.1 at 25.)

After Detective Johnson examined Plaintiff's criminal background—and pursuant to CPD procedure—he interviewed three officers that had arrested Plaintiff: Officer Harold Bone, Officer Daniel Noon, and Officer Alan Lucas. (Defs.' 56.1 at 26.) These officers confirmed that Plaintiff had been arrested numerous times for various offenses, and informed Detective Johnson that they knew Plaintiff to be a drug dealer, gang member, and supplier of guns to other gang members. (Defs.' 56.1 at 31, 35, 39.)

Detectives Johnson and Rodgers submitted their background investigation reports to Sergeant Parizanski, without making a recommendation as to Plaintiff's qualifications. (Defs.' 56.1 at 40.) Based upon these reports, Sergeant Parizanski recommended to Commander Thomas Sadler, the Director of the CPD's Personnel Division, that Plaintiff be disqualified from consideration for employment based on Plaintiff's "criminal conduct." (Defs.' 56.1 at 43.) [4] Commander Sadler offered the same recommendation to John Harris, Deputy Superintendent of the CPD's Bureau of Administrative Services, who in turn recommended to Glenn E. Carr, Commissioner of the Department of Personnel, that Plaintiff "be removed from the 1991 and 1993 eligibility lists for the position of probationary police officer." (Defs.' 56.1 at 44–45.) Commissioner Carr informed Plaintiff by mail that, "on the basis of his background investigation, the CPD had decided to disqualify [him] from further consideration in the police officer hiring process." (Defs.' 56.1 at 46.)

After notifying Plaintiff that he was not qualified for employment with the CPD, Defendants discovered that Plaintiff's criminal background was even more extensive than initially believed. In 1987, Plaintiff was found guilty of disorderly conduct.[5]

---

must cite "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiff repeatedly fails to make specific references in responding to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts. (Pl.'s Resp. 56.1 at 17–19, 23–39, 62–63, 69.) In addition, Plaintiff frequently defers and "neither admits nor denies" facts without negating Defendants' statements, as he does here. (Pl.'s Resp. 56.1 at 15, 20, 22, 40, 42–47.) Further, many of Plaintiff's denials rely solely on his self-serving affidavit. (Pl.'s Resp. 56.1 at 41, 48–49, 59, 61.) Finally, some of Plaintiff's responses do not even address Defendants' stated facts, but merely restate his legal conclusions. (Pl.'s Resp. 56.1 at 52, 57–58.) The Court accepts Defendants' statement of the facts where Plaintiff fails to comply with Local Rule 56.1. *See Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313 (7th Cir.1995).

4. The CPD disqualifies applicants who have been convicted of various crimes, "including crimes causing or threatening bodily harm and/or disorderly conduct as defined by Illinois statutes." (Defs.' 56.1 at 17.) Further, the CPD disqualifies applicants who have engaged in "any act or conduct prohibited by various state or federal statutes or municipal ordinances, even if that act or conduct did not result in a criminal conviction." (Defs.' 56.1 at 18.)

5. Plaintiff's documented conviction occurred prior to Plaintiff's swearing under oath that he had never been convicted in support of his 1992 Petition to Expunge. Plaintiff contends, via a self-serving affidavit, that the conviction never occurred. Self-serving affidavits, without support in the record, will not defeat a motion for summary judgment. *See Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 723–24 (7th Cir.1998). Similarly, Plaintiff's brother's affidavit fails to offer more than "conclusory statements ... which do not produce a genuine issue for trial under Rule 56(c)." *Jordan v. Summers,* 205 F.3d 337, 344 (7th Cir.2000). In light of the De-

(Defs.' 56.1 at 61.) Sometime in 1989, Plaintiff pled guilty to unlawful possession of a handgun and received nine months supervision. (Defs.' 56.1 at 62.)

More recently, on November 13, 1998, Plaintiff was charged with domestic battery for allegedly physically assaulting his former fiancee, Sandra Calderone. (Pl.'s Resp. 56.1 at 64.) Cook County Circuit Court Judge Jesse Reyes found Plaintiff guilty of reckless conduct under 720 ILCS 5/12–5 (West 1998).

On August 27, 1999, Plaintiff was discharged from his job at the Chicago Housing Authority Police Department, where he had been working since July 1994, for "violating department general orders forbidding unjustified physical attacks on or off duty, and for bringing discredit to the department by violating a City ordinance." [6] (Pl.'s Resp. 56.1 at 69.)

Plaintiff concedes that "[n]one of the individual defendants used any racially derogatory terms or made any racially derogatory comments to Plaintiff." (Pl.'s Resp. 56.1 at 54.) The parties agree that African Americans make up 25% of the police officers in the CPD. (Pl.'s 56.1 at 11.) Further, the Court notes that the CPD has hired qualified applicants, including African Americans, with arrest records for the position of probationary police officer. (Defs.' 56.1 at 22.)

## PROCEDURAL HISTORY

Plaintiff filed a charge with the Illinois Human Rights Department ("IHRD") on March 8, 1996, claiming that Defendants refused to hire him because of his arrest record and his race, in violation of state law. On November 1, 1996, the IHRD dismissed Plaintiff's claims for lack of substantial evidence, concluding that Defen-

fendants had relied upon sources other than Plaintiff's expunged arrest record in disqualifying Plaintiff. (Pl.'s Ex. 10 at 3.) On September 30, 1997, the Equal Employment Opportunity Commission issued Plaintiff a right to sue letter on Plaintiff's federal discrimination charges.

Plaintiff filed a five-count Complaint against Defendants in federal court on December 22, 1997. Count One, brought under 42 U.S.C. § 2000e ("Title VII"), alleges that Defendants engaged in racial discrimination in rejecting Plaintiff's employment application. Count Two charges that Defendants wrongfully relied upon Plaintiff's expunged arrest records, in violation of the Illinois Human Rights Act, 775 ILCS 5/2–103. Court Three claims that Defendants violated 42 U.S.C. § 1983 by intentionally depriving Plaintiff of his equal protection rights. Count Four charges that Defendants intentionally discriminated against Plaintiff in violation of 42 U.S.C. § 1981. Count Five, brought under 42 U.S.C. § 1985, alleges that Defendants conspired to violate Plaintiff's constitutional rights. Finally, Count Six sets forth state law fraud, deceit, and misrepresentation claims.

On Defendants' Motion to Dismiss, Judge Bucklo dismissed Counts Two and Six, and dismissed Defendant Rodgers from Count V of Plaintiff's Complaint. *McCraven,* 18 F.Supp.2d at 885.

## *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of showing that the record contains no genuine issue of fact.

---

fendants' evidence of the conviction, these self serving affidavits are insufficient to raise an issue of fact as to whether Plaintiff was convicted of disorderly conduct.

**6.** Plaintiff admits this fact; however, he asserts that the "discharge was reversed and the

Plaintiff is being reinstated with the Chicago Housing Police Department." (Pl.'s Resp. 56.1 at 69.) Plaintiff does not cite any supporting materials in the record to support this contention, and again fails to comply with Local Rule 56.1.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to show, through specific facts in the record, that there is "a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. The Court examines the record in a light most favorable to the non-movant, but conclusory allegations without evidentiary support will not suffice. *Miller v. Borden, Inc.,* 168 F.3d 308, 312 (7th Cir.1999).

## ANALYSIS

Although Plaintiff relies upon various federal statutes and theories of recovery, his surviving claims all allege that Defendants refused to hire him because of his race. At the core of these claims is the propriety and extent of Defendants' reliance upon Plaintiff's arrest records. Therefore, before addressing Plaintiff's claims under Title VII and 42 U.S.C. §§ 1981, 1983, and 1985, the Court will briefly discuss Plaintiff's expunged arrest records.

Although Plaintiff obtained a court order expunging his criminal record, Defendants contend that this order is void because Plaintiff failed to disclose his 1987 conviction in his Petition to Expunge. The Illinois Criminal Identification Act enables a court to expunge criminal records only in the absence of a prior conviction, and further provides that any court order contrary to its provisions is void. 20 ILCS 2630/5(a) and (f) (West 2000).

■ Moreover, Illinois courts recognize that an order is void where the court lacks the inherent power to enter the order; that is, when it is "beyond dispute that the original order of expungement is in direct violation of applicable statutory provisions." *People v. Holum,* 166 Ill.App.3d 658, 661, 117 Ill.Dec. 258, 520 N.E.2d 419, 420 (2d Dist.1988). Given Plaintiff's 1987 conviction, which he failed to disclose in his Petition to Expunge, it is apparent that the Expungement Order is contrary to the Criminal Identification Act and is, therefore, void. "A void judgment is from its inception a complete nullity and without legal effect." *In re Application of Cook County Collector,* 228 Ill.App.3d 719, 731, 170 Ill.Dec. 649, 593 N.E.2d 538, 547 (1st Dist.1991).

■ In addition, Defendants are correct in asserting that the Expungement Order does not vitiate the fact that Plaintiff had engaged in the underlying criminal activity, and that the CPD had access to independent sources regarding Plaintiff's criminal activity. *Del Rivero v. Cahill,* 71 Ill. App.3d 618, 622, 28 Ill.Dec. 188, 390 N.E.2d 355, 358–59 (1st Dist.1979). For example, the Expungement Order could not operate to erase the memories of the officers who had arrested Plaintiff, and Plaintiff's two previous applications to the CPD apparently contained information regarding his criminal history. *Id.* This conclusion is bolstered by the IHRD's finding that the CPD learned of Plaintiff's extensive criminal background through sources independent of his expunged arrest record.

Finally, the question as to whether Defendants are guilty of violating the Expungement Order is not properly before this Court. Plaintiff's initial Complaint alleged that Defendants' conduct violated state law, and Judge Bucklo dismissed that claim. *McCraven,* 18 F.Supp.2d at 882. Rather, this Court must determine whether Defendants violated Plaintiff's rights under Title VII and §§ 1981, 1983, and 1985.

Under these circumstances, the Court cannot accept Plaintiff's assertion that Defendants could not and cannot rely upon his criminal history to disqualify him from employment simply because he had obtained an Expungement Order. With this in mind, the Court will turn to Plaintiff's discrimination claims.

## II. *Race Discrimination Under Title VII and 42 U.S.C. § 1981*

In Counts I and IV of his Complaint, Plaintiff raises disparate treatment and disparate impact claims under Title VII

and § 1981, respectively.[7] To establish disparate treatment, Plaintiff must demonstrate that Defendants treated him differently because of his race. Conversely, in establishing his disparate impact claim, Plaintiff need not show that Defendants intended to discriminate against him; only that Defendants' reliance upon arrest records in evaluating applicants has a disproportionally negative impact on African Americans. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir.1996) (citations omitted). The Court will address these claims seriatim.

## A. Disparate Treatment

Both Title VII and § 1981 prohibit discrimination based upon race. The two methods of establishing disparate treatment discrimination are by direct evidence (taking the form of "I refused to hire you because of your race"), or by indirect evidence under the *McDonnell Douglas* burden-shifting approach. *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1044 (7th Cir.2000). Plaintiff contends that he has presented both direct and indirect evidence that Defendants' refusal to hire him was discriminatory.

### 1. *Direct Evidence*

Under the direct evidence approach, "this Circuit has ... held that a combination of direct and circumstantial evidence, 'none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff,' may allow a plaintiff to surpass the summary judgment

hurdle." *Hasham*, 200 F.3d at 1044 (quotations omitted). Plaintiff's direct evidence must demonstrate "the particular fact in question without reliance on inference or presumption."[8] *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir.1997) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). The evidence "must relate to the motivation of the decision maker responsible for the contested decision." *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir.1996).

Plaintiff offers the following as direct evidence of discrimination: 1) the Defendants' failure to rely upon Plaintiff's alleged 1987 conviction in connection with his 1992 Petition to Expunge or the CPD's 1994 background investigation demonstrates that his alleged 1987 conviction is fictitious; 2) "Defendants' possession and use of expunged criminal records in its background investigation of Plaintiff is not only of suspicious timing but reflects discriminatory behavior towards African Americans;" and 3) statistics showing that African Americans are arrested at a higher rate than Caucasians and that African Americans are underrepresented on the CPD. (Pl.'s Resp. Mem. Mot. Summ. J. [Pl.'s Resp.] at 4.) The Court finds that this evidence does not constitute direct or circumstantial evidence that Defendants refused to hire Plaintiff because of his race.

The validity or invalidity of Plaintiff's 1987 conviction is not direct or circumstantial evidence that Defendants discrimi-

---

7. Because § 1981 race discrimination claims are analyzed under the same framework as Title VII discrimination claims, *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir.1996), the Court will address Plaintiff's disparate treatment claim and then Plaintiff's disparate impact claim under both statutes concurrently.

8. The Court notes that the majority of Seventh Circuit opinions in Title VII cases have ruled that direct evidence may not rely on inference or presumption. *See, e.g., Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.

1997). At the same time, however, the court has reaffirmed that the definition of direct evidence incorporates some elements of the indirect burden-shifting method of proof. *See Council 31, Am. Fed'n of State, County and Mun. Employees, AFL–CIO v. Doherty*, 169 F.3d 1068, 1072 (7th Cir.1999); *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir.1997) (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)). This Court, therefore, finds that *Troupe* remains good law, and will consider circumstantial evidence under the direct evidence test.

nated against Plaintiff. Both parties concede that Defendants did not rely upon the 1987 conviction in rejecting Plaintiff's application. Rather, Defendants offer evidence of the 1987 conviction in support of its argument that after-acquired evidence bars this Court from ordering the CPD to hire Plaintiff.

■ In addition, Plaintiff fails to explain how Defendants' investigation into his background constitutes direct evidence of discrimination. Plaintiff states, without any elaboration, that Defendants' possession and use of expunged arrest records was "of suspicious timing." Detective Johnson's investigation of Plaintiff's previous criminal conduct does not represent suspicious timing of discrimination. On the contrary, it represents the requisite procedure that all applicants are subjected to before the CPD will extend an offer of employment.

■ Finally, the Court finds that Plaintiff's statistics are insufficient to establish discrimination. Plaintiff asserts that the CPD's practice of examining applicants discriminates against African Americans, who are more likely to have been arrested than Caucasians. According to Plaintiff, because a greater percentage of African Americans are arrested, a greater number will be disqualified under the current review of applications. Plaintiff asserts that it necessarily follows that the CPD's reliance upon background investigations in evaluating applicants evidences the CPD's intent to exclude African Americans from becoming police officers. (Pl.'s Resp. at 4.)

The Court disagrees. Plaintiff's statistics fail to demonstrate that the CPD rejects a higher percentage of African–American applicants [9] or that the CPD conducts its background investigations in a discriminatory manner. Plaintiff would have the Court take the additional step of

finding that the higher percentage of African–American males being arrested is associated with Plaintiff's failure to be hired as a police officer. This logic fails because Plaintiff cannot even demonstrate that the background investigation process results in a disproportionate percentage of African–American applicants being rejected. A statistical disparity between African–American males and Caucasian males arrested in the City of Chicago or in the United States, alone, does not prove race discrimination. *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n. 8 (7th Cir. 1990) (noting that "statistics ... are of relatively low importance in an individual disparate treatment case.") Further, the statistics which show that 25% of the CPD is African American suffers from the same deficiency, in that underrepresentation statistics alone will not prove Title VII discrimination. *Id.* Finally, Plaintiff's theory is even more tenuous given his concession that the CPD does not disqualify applicants because they have an arrest record. (Pl.'s Resp. 56.1 at 21.)

In conclusion, the Court finds that Plaintiff's evidence of discrimination, viewed separately or as a whole, is insufficient to constitute direct evidence that Defendants refused to hire Plaintiff because of his race. This is not the end of the disparate treatment analysis, however, as Plaintiff also seeks to establish discrimination under *McDonnell Douglas*.

### 2. Indirect Burden Shifting Method.

Under the indirect, *McDonnell Douglas* burden-shifting framework, the plaintiff shoulders the initial burden of establishing a prima facie case of a discriminatory failure to hire. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the prima facie case is made, a presumption of discrimination arises and the burden of pro-

---

**9.** A comparison between the percentage of African–American applicants and the racial makeup in the police department would be more appropriate to this case, *see Hazelwood*

*Sch. Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); however, this statistic alone would not establish discrimination.

duction shifts to the defendant to offer a nondiscriminatory justification for its employment decision. *Cowan*, 123 F.3d at 445. If the employer successfully presents such a reason, then the presumption of discrimination dissolves and the plaintiff "must show that the defendants' proffered reason for the [failure to hire] was false and only a pretext for discrimination." *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1290 (7th Cir.1997).

To establish a prima facie case, Plaintiff must demonstrate the following four elements:

(1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ Defendants introduce compelling evidence that Plaintiff was not qualified to serve on the CPD. The CPD's Background Investigation Standards provide that applicants who have engaged in "any act of conduct prohibited by various state or federal statutes ... even if the conduct did not result in a criminal conviction" may not be qualified to serve on the CPD. (Defs' 56.1 at 18.) Detective Johnson's investigation revealed not only that Plaintiff had engaged in various acts of prohibited conduct, but also that he was known by members of the CPD to be a gang member, drug dealer, and gun runner. The Court agrees that Plaintiff's history of extensive criminal conduct renders him unqualified for the position of probationary police officer. Because he was not qualified for the position of probationary police officer with the CPD, Plaintiff fails to establish the second and third elements of his prima facie case.

Even accepting Plaintiff's argument that he was a qualified CPD candidate, Defendants persuasively argue that Plaintiff's various run-ins with the law provide a legitimate, nondiscriminatory reason for excluding Plaintiff from employment with the CPD. The responsibility of carrying a gun and protecting City residents is a serious and often dangerous job. As the court in *Clinkscale v. City of Philadelphia*, No. Civ. A. 97–2165, 1998 WL 372138, at *1–2 (E.D. Pa. June 16, 1998) explained, police departments are justified in exploring an applicant's criminal background:

Plaintiff argues that in his case, the subsequently dismissed charges, acquittal and expungement of his record are consistent with actual innocence. However, in other cases, these outcomes may well be the result of other things—lack of evidence, recalcitrant witnesses, participation in an accelerated rehabilitative disposition (ARD) program, or juvenile offenses, for example. Even an unjustified arrest may be indicative of character traits that would be undesirable in a police officer, such as a quick temper, poor attitude or argumentativeness.... To give someone a badge, a gun, and—practically speaking—almost unlimited authority over his or her fellow citizens is a grave responsibility. In light of the serious public safety concerns at issue here, I find that, as a matter of law, defendants' policy serves substantial and legitimate interests.

Plaintiff attempts to satisfy his burden of demonstrating that Defendants' reason for not hiring him is pretextual by offering "proof" that the CPD hired a white applicant with a conviction as a police officer. *See Stalter v. Wal–Mart Stores*, 195 F.3d 285, 289 (7th Cir.1999) (Plaintiff may show pretext by demonstrating that the proffered justification is unworthy of credence, is lacking in factual basis, or is not the real reason Plaintiff was not hired.) However, Plaintiff cites to no evidence to support his claim that the CPD hired a Caucasian male even though he had pled guilty to child abduction. As such, this claim fails

to conform with Local Rule 56.1(b)(3)(A) and is disregarded.

The Plaintiff's failure to demonstrate that he was qualified for the position of probationary police officer, and Defendants' unrebutted, legitimate reason for not hiring Plaintiff preclude Plaintiff from recovering on his disparate treatment claim.

### B. Disparate Impact

Plaintiff also argues that he has demonstrated that Defendants' practice of examining applicants' arrest records has a disparate impact upon African Americans. Facially neutral policies that have a disparate impact upon protected classes, unjustified by the defendant's legitimate business needs, are discriminatory. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir.1996).

■ To establish a prima facie case under a disparate impact theory, Plaintiff must: 1) identify the employment practice giving rise to the statistical disparity; and 2) demonstrate causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). If Plaintiff establishes the prima facie case, the burden then shifts to Defendants to prove that the "hiring methods

responsible for the disparity are necessary to the efficient conduct of [its] business." *Taylor v. Sheriff of Cook County*, 167 F.3d 1155, 1156 (7th Cir.1999) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

■ In support of his disparate impact claim, Plaintiff offers statistical evidence that African Americans are arrested at a higher rate than Caucasians in the general population, and that the CPD employs a lower percentage of African Americans than exist in the general population. These statistics are deficient in a number of respects, not the least of which is that Plaintiff has failed to make any showing of causation.[10] *Gilty*, 919 F.2d at 1254 ("In disparate impact cases, it is eligibility rate, not underrepresentation, that is telling.") Plaintiff's statistics fail to establish that the CPD's practice of evaluating arrest records disproportionally disqualifies African Americans. Absent evidence that African Americans are disproportionally represented on the CPD because of the challenged practice, Plaintiff's claim fails. The Supreme Court offered the following illustration to demonstrate the importance of causation evidence.

[If] the absence of minorities holding such positions is due to a dearth of qualified nonwhite applicants (for reasons that are not [Defendants' fault, Defendants'] selection methods or employment practices cannot be said to have had a 'disparate impact' on nonwhites.

10. Plaintiff cites to The Illinois Advisory Committee to the United States Commission on Civil Rights' Report entitled "Police Protection of the African American Community in Chicago: An Update" ("Report") for statistics regarding African–American representation on the CPD. (Pl.'s Ex. 24.) The Report finds that African Americans make up 25% of the CPD, and that all minorities encompass 37% of the CPD. Notably, the Report also states that only 42.8% of the applicants scoring a "well qualified" on the CPD's 1993 entry recruitment exam were minorities; the Report did not include separate statistics for African Americans. (Pl.'s Ex. 24 at 27.) This indicates that the CPD hired a high percentage of the "well qualified" minority applicants de-

spite the CPD's background investigation methods. Also, the Report discusses the percentage of African–American officers compared to the entire African–American population in Chicago; although this data is relevant for the Report's purposes, the Report does not identify that portion of the African–American population that should be included in the relevant labor market. *See Cox v. City of Chicago*, 868 F.2d 217, 222–23 (7th Cir.1989). Finally, although acknowledging that minorities are underrepresented on the CPD compared to their gross numbers in the population, the Report commends the CPD for its efforts insupporting a diverse police force and recruiting minority candidates. (Pl.'s Ex. 24 at 37.)

*Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 651–52, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (noting that "liberal civil discovery rules give plaintiffs broad access to employers' record in an effort to document their claims.") [11]

■ Even if Plaintiff had established his prima facie case, Defendants have a legitimate business reason for relying upon its background investigation procedures in evaluating applicants; police officers have an awesome responsibility in serving the public and Defendants are justified in ensuring that applicants can meet this responsibility. Plaintiff has offered no argument or evidence to counter Defendants' reliance upon the CPD background investigation procedures as a legitimate business justification. Therefore, his disparate impact claim cannot survive summary judgment.

### III. Count III: 42 U.S.C. § 1983

■ Plaintiff claims that Defendants violated his equal protection rights under 42 U.S.C. § 1983. To succeed on this claim, Plaintiff must demonstrate that Defendants, acting under the color of state law, intentionally deprived him of a constitutionally-protected right. *McNabola v. Chicago Transit Authority,* 10 F.3d 501, 513 (7th Cir.1993). Evidence of intentional conduct is critical to a plaintiff's equal protection claim:

> The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or

purposeful discrimination to show an equal protection violation.... [T]hat a decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Nabozny v. Podlesny,* 92 F.3d 446, 453–54 (7th Cir.1996).

■ Plaintiff has failed to offer sufficient evidence of Defendants' discriminatory intent. Plaintiff relies upon the Second Circuit's ruling in *Hayden v. County of Nassau,* 180 F.3d 42 (2d Cir.1999) in support of his claim that statistics demonstrating that African Americans are under-represented on the CPD is sufficient evidence of an equal protection violation. To the contrary, *Hayden* makes clear that impact evidence alone is insufficient to demonstrate the requisite intent. *Id.* at 48. Rather, plaintiffs can demonstrate an equal protection violation only by demonstrating that a defendant relied upon 1) a policy that expressly classifies persons on the basis of race; or 2) a neutral policy that is applied discriminatorily; or 3) a neutral policy that is motivated by discriminatory animus and its application has a discriminatory effect. *Id.* Because Plaintiff has failed to introduce evidence of discriminatory intent or application, or a facially discriminatory policy, his equal protection claim fails. *Indianapolis Minority Contrs. Ass'n., Inc. v. Wiley,* 187 F.3d 743, 753 (7th Cir.1999) (evidence of statistical disparities are insufficient to demonstrate defendants' motivation or intent).

**11.** In addition to raising the prima facie hurdle for plaintiffs the *Wards Cove* Court created controversy with regard to the second stage of the disparate impact analysis. The Court ruled that a defendant's burden at the second stage of the disparate impact analysis was merely one of production—not persuasion—and set forth an employer-friendly definition of "business necessity." 490 U.S. at 659, 109 S.Ct. 2115. This section of the Court's analysis drew a swift reaction from Congress, which passed an amendment to Title VII, the Civil Rights Act of 1991 ("The 1991 Act"), in response to the *Wards Cove* opinion. 42 U.S.C. § 2000e–2(k) (1991). The 1991 Act restored the defendant's burden to that of persuasion, and rejected the *Wards Cove* Court's lax definition of business necessity. *See* Linda Lye, *Title VII's Tangled Tale: The Erosion And Confusion of Disparate Impact And the Business Necessity Defense,* 19 BERK. J. E & LAB. L. 315, 334–35 (1998). However, *Wards Cove* still remains good law with regard to a plaintiff's prima facie case. *See generally Vitug,* 88 F.3d at 513.

## IV. Count V: 42 U.S.C. § 1985

Plaintiff claims that the Defendants conspired to deprive him of his federal rights. 42 U.S.C. § 1985 (prohibiting persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws.") To establish a conspiracy claim under § 1985, Plaintiff must demonstrate:

> (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*Indianapolis Minority Contrs. Ass'n,* 187 F.3d at 754.

Plaintiff has offered no evidence that Defendants ever mutually understood that they would disqualify Plaintiff, and thus fails to establish a genuine issue of material fact with respect to his conspiracy claim. This failure to show a mutual meeting of the minds is fatal to his conspiracy claim.

■ Moreover, even if Plaintiff could set forth the conspiracy elements, intracorporate immunity shields Defendants from such a claim. Intracorporate immunity provides that a corporation only acts through its officers, directors, and agents and is incapable of conspiring with those designated to act on its behalf. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Travis v. Gary Comm. Mental Health Ctr. Inc.,* 921 F.2d 108 (7th Cir. 1990) (Intracorporate immunity extends to suits brought under § 1985). Courts recognize two exceptions to the protection afforded by intracorporate immunity: 1) if "the conspiracy was part of some broader discriminatory pattern . . . or that it in any

way permeated the ranks of the organization's employees;" or 2) "where corporate employees are shown to have been motivated solely by personal bias." *Hartman v. Board of Trustees of Community College Dist. No. 508,* 4 F.3d 465, 470–71 (7th Cir.1993).

■ Plaintiff has failed to demonstrate that either of the *Hartman* exceptions apply in this case. Plaintiff asserts that evidence that "[Detective] Johnson investigated the expunged arrests very thoroughly and even continued the investigation for Rodgers," shows that the individual Defendants acted with personal malice. (Pl.'s Resp. at 16.) The Court disagrees, and notes that Plaintiff has offered no evidence that Detective Johnson's investigation was unusually thorough, and has failed to rebut Defendants' evidence that reassigning the investigation from Detective Rodgers to Detective Johnson complied with standard CPD policies. In addition, Plaintiff has failed to introduce any evidence in support of his allegations that Messrs. Sadler, Harris, and Carr encouraged Detective Johnson to rely upon expunged records in investigating Plaintiff because of Plaintiff's minority status. Therefore, even if Plaintiff had introduced evidence of a conspiracy, Defendants would be immune under the doctrine of intracorporate immunity and Plaintiff's § 1985 conspiracy claim must fail.[12]

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment, and dismisses Plaintiff's Title VII disparate treatment, disparate impact, § 1981, § 1983, and § 1985 claims.

**IT IS THEREFORE ORDERED** that:

Defendants' Motion for Summary Judgment, be, and the same hereby is, **GRANTED.**

**IT IS FURTHER ORDERED** that:

Defendants' after acquired evidence or qualified immunity arguments.

---

12. Given the Court's ruling that summary judgment is warranted, it need not address

Plaintiff's Complaint, be, and the same hereby is, **DISMISSED WITH PREJUDICE.**